NSK LTD. and NSK CORPORATION,
Plaintiffs,

v.

UNITED STATES, Defendant,

Federal–Mogul Corporation;
The Torrington Company,
Defendant–Intervenors.

Slip Op. 95–178.
Court No. 93–08–00469.

United States Court of International Trade.

Nov. 14, 1995.

States Department of Commerce, International Trade Administration ("Commerce"), entitled *Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order ("Final Results")*, 58 Fed.Reg. 39,729 (1993), as amended, *Anti-friction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 58 Fed.Reg. 42,288 (1993), *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 58 Fed. Reg. 51,055 (1993), and *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 59 Fed.Reg. 9,469 (1994).

Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jeffrey M. Telep); of counsel: Michelle Behaylo, Alexandra Levinson, Thomas Fine, Anna Park and David Ross, Attorney–Advisors, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC, for defendants.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Larry Hampel and Joseph A. Perna, V), Washington, DC, for defendant-intervenor Federal–Mogul Corporation.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr. and Patrick J. McDonough), Washington, DC, for defendant-intervenor The Torrington Company.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, NSK Ltd. and NSK Corporation (collectively "NSK"), commenced this action challenging certain aspects of the final results of administrative review of the United

### Background

On April 27, 1993, Commerce published the preliminary results of its administrative review of antidumping duty orders on anti-friction bearings (other than tapered roller bearings) and parts thereof from Japan, France, Germany, Italy, Romania, Singapore, Sweden, Thailand and the United Kingdom. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 58 Fed.Reg. 25,616 (1993).

On July 26, 1993, Commerce published the Final Results at issue. *See Final Results*, 58 Fed.Reg. at 39,729. NSK moves pursuant to Rule 56.2 of the Rules of this Court for partial judgment on the agency record, alleging the following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) rejection of NSK's related party transfer prices in favor of best information available ("BIA") in calculating foreign market value ("FMV"); (2) determination of home market levels of trade based on customer categories; (3) classification of post-

sale price adjustment rebates and stock transfer commissions as indirect selling expenses; (4) addition of U.S. repacking expenses to United States price; (5) deduction of further manufacturing expenses from exporter's sales price; and (6) commission of clerical errors.[1] *Memorandum of Points and Authorities in Support of Motion for Partial Judgment on the Agency Record* ("*NSK's Brief*") at 23–52.

### Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

■ The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on the grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### 1. Use of Best Information Available to Calculate Foreign Market Value

In this review, Commerce decided to use second tier BIA to calculate FMV based on the following reasoning:

Despite our requests in the initial and supplemental questionnaires, NSK failed to provide either purchase prices from unrelated parties that we could have used to determine whether the transfer prices that NSK paid to related parties for inputs were at arm's length or cost of production data to demonstrate that the transfer prices were not less than COP. Further, the standard established by Japanese law is not sufficiently similar to that established in section 773(e)(2) of the Tariff Act for us to rely on NSK's compliance with that law as evidence that transfer prices paid by NSK are arm's-length prices. Therefore, we determine that NSK's CV data do not provide a reliable basis for FMV. As a result, we have used second tier BIA to determine the dumping margins for those U.S. sales for which CV would have been used as FMV.

*Final Results*, 58 Fed.Reg. at 39,754. According to NSK, Commerce's actions were "arbitrary" and constituted "abuse of discretion." *NSK's Brief* at 23.

NSK contends that 19 U.S.C. § 1677b(e)(3) (1988) dictates that Commerce may not request from a respondent cost data about parts purchased from related suppliers absent a "specific and objective basis" for suspecting that the transfer price paid to a particular related supplier for a major input is below that supplier's cost. *NSK's Brief* at 23. NSK supports this position by highlighting the language in 19 U.S.C. § 1677b(b) (1988)[2] which requires "reasonable grounds to believe or suspect" below cost sales before Commerce must determine whether such sales were in fact made. *Id.* at 23–24. NSK cites *Al Tech Specialty Steel Corp. v. United States*, 6 CIT 245, 250, 575 F.Supp. 1277,

---

**1.** Count IV of plaintiffs' original complaint was decided in a separate opinion. *See NSK Ltd. v. United States*, 17 CIT 1104, Slip Op. 93–195, 1993 WL 405406 (Oct. 8, 1993). In light of a decision and mandate of the Court of Appeals for the Federal Circuit, this issue was remanded to Commerce and the results of the remand were affirmed. *See NSK Ltd. v. United States*, Slip Op. 95–40, 1995 WL 116256 (Mar. 14, 1995). Plaintiffs abandoned any further challenge to this issue. *See Plaintiffs' Reply Memorandum in Support of Motion for Judgment on the agency Record* ("*NSK's Reply Brief*") at 17.

**2.** Section 1677b(b) of Title 19, United States Code, provides:

Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States, have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise.

1282 (1983), *aff'd on other grounds,* 745 F.2d 632 (Fed.Cir.1984), for the proposition that 19 U.S.C. § 1677b(b) requires "a *specific* and *objective* basis for suspecting a *particular* foreign firm is engaged in home market sales at prices below its cost of production" in order for Commerce to be required to investigate a foreign manufacturer's cost of production ("COP"). *NSK's Brief* at 24. Applying the same standard to 19 U.S.C. § 1677b(e)(3), NSK maintains that there is no evidence on the record that NSK purchased parts from related suppliers for prices below COP. *Id.* at 25. In light of the lack of such evidence, NSK states that Commerce should consider relevant NSK's compliance with Japanese law which prohibits NSK from negotiating less than fair market prices with its related suppliers. *Id.* at 26, n. 6. NSK further submits that it was unfair for Commerce to require this data from NSK and not from other respondents. *Id.* at 25–26.

In addition, NSK asserts that it sufficiently proved that the price paid for parts purchased from related parties fairly reflected market values. *Id.* at 26. In support of its position, NSK states that it submitted to Commerce the same information that Commerce accepted in two prior reviews as proof of NSK's arm's-length relationship with its related suppliers. *Id.* NSK emphasizes that based on the information submitted in past reviews, Commerce should have known that NSK could not supply information showing that for every part purchased from a related supplier, NSK purchased the same or similar parts from unrelated suppliers at the same price. *Id.* at 27. NSK further claims that Commerce's supplemental questionnaires never indicated that the data provided by NSK were inadequate. *Id.* NSK concludes that the application of BIA is inappropriate in light of both NSK's responsiveness to Commerce's requests for information and Commerce's failure to indicate insufficiencies in NSK's response. *Id.* at 30.

Alternatively, NSK asserts that even if Commerce properly rejected NSK's transfer prices, Commerce should have used the best evidence available instead of BIA. According to NSK, use of the best evidence avail-

able under these circumstances is mandated by 19 U.S.C. § 1677b(e)(2) & (3) (1988).

Finally, NSK argues that Commerce unlawfully applied BIA to transactions which did not involve related party inputs, specifically, finished bearings and inputs from unrelated suppliers. *Id.* at 33–35. NSK contends that Commerce never requested information concerning whether NSK purchased finished bearings from related suppliers at fair market value or above the suppliers' costs. *Id.* at 34. As such, NSK submits that Commerce should have calculated the constructed value for all finished bearings purchased from related suppliers based on data submitted by NSK. *Id.* at 35. In addition, NSK maintains that Commerce should have calculated the constructed value for all bearings further manufactured in the United States with inputs from unrelated suppliers. *Id.* at 35–36.

In rebuttal, Commerce asserts that its actions were consistent with 19 U.S.C. § 1677b(e)(2) & (3). *Defendant's Memorandum in Opposition to the Motion of NSK Ltd. and NSK Corporation for Judgment Upon the Agency Record* ("*Commerce's Brief*") at 10–12. Commerce claims that NSK's "Section D" response to Commerce's questionnaire did not adequately document that related party transactions were made at arm's length. *Commerce's Brief* at 14. Commerce further contends that NSK failed to supply more detailed information in response to Commerce's deficiency letter. *Id.* at 14–16. Commerce maintains that it properly rejected NSK's supplemental responses urging Commerce to accept the Japanese Government's determination that the transactions between NSK and its related subcontractors were at "fair market prices." *Id.* at 15–16. According to Commerce, the Japanese Government assumes that transfer prices reflect "fair market prices" as long as the transfer prices are not "unreasonably low." *Id.* at 16. Commerce states that such a determination by the Japanese Government is irrelevant and does not determine whether transactions are at arm's length for purposes of 19 U.S.C. § 1677b(e). *Commerce's Brief* at 16. Commerce contends that because NSK failed to demonstrate that the prices it

paid related suppliers were arm's length and to identify any other transactions that Commerce could have considered in determining whether the transfer prices reflected arm's-length prices, Commerce properly resorted to BIA pursuant to 19 U.S.C. § 1677e(c) (1988). *Commerce's Brief* at 17.

Furthermore, Commerce maintains that NSK's submissions in the past two reviews were different from the submissions in the review at issue. *Id.* at 18. Commerce also asserts that "the deficiencies in NSK's data were more serious and detracted from the overall reliability of NSK's responses to a greater degree than those found in the responses of the other respondents." *Id.* at 21. Commerce emphasizes that NSK should have known its response in the present review was deficient after Commerce requested supplemental information. *Id.*

According to Commerce, it properly used BIA instead of the best evidence available. Commerce argues that it needed cost data to determine whether it could rely on the best evidence available for purposes of calculating constructed value. *Id.* at 22. Since NSK failed to report the data requested, Commerce asserts that use of BIA was appropriate. *Id.*

Commerce also claims that it properly applied BIA to finished bearings that NSK purchased from related suppliers. *Id.* Commerce contends that 19 U.S.C. § 1677b(e)(2) does not specifically exempt finished products from the definition of "elements of value." *Commerce's Brief* at 23 (quoting 19 U.S.C. § 1677b(e)(2)). Commerce claims that it requested cost information about finished bearings in a supplemental questionnaire by using the word "products." *Commerce's Brief* at 23. Commerce agrees with NSK, however, that it incorrectly applied BIA to certain parts purchased exclusively from unrelated suppliers. *Id.* at 23–24. Commerce suggests that the Court remand to Commerce to correct the clerical error. *Id.* at 24.

In support of Commerce, The Torrington Company ("Torrington") argues that the standard for pursuing an investigation under 19 U.S.C. § 1677b(b), as interpreted by the court in *Al Tech*, 6 CIT at 250, 575 F.Supp.

at 1282, does not imply which party has the burden of submitting the necessary evidence. *Response of The Torrington Company to Plaintiffs' Memorandum in Support of its Motion for Partial Judgment on the Agency Record ("Torrington's Brief")* at 12. According to Torrington, the burden under 19 U.S.C. § 1677b(b) has been placed on domestic parties as opposed to foreign respondents. *Torrington's Brief* at 12–13. Torrington further asserts that there is no basis for placing the burden of producing evidence under 19 U.S.C. § 1677b(e)(3) on domestic industry. *Id.* at 13. Federal–Mogul Corporation ("Federal–Mogul") also supports Commerce by emphasizing that data concerning the cost of inputs transferred between related parties, unlike below-cost sales data, can only be obtained in response to a request by Commerce. *Response of Federal–Mogul Corporation, Defendant–Intervenor, to Plaintiffs' Motion for Partial Judgment on the Agency Record ("Federal–Mogul's Brief")* at 11–12.

■ The central issue presented by NSK's arguments is whether Commerce possessed the authority to request cost data concerning parts purchased from related suppliers without a specific and objective basis for suspecting that the transfer prices were below cost. An analysis of the following statutory provisions is necessary to decide this issue:

**(e) Constructed value**

**(1) Determination**

For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—

**(A)** the cost of materials ...

**(B)** an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade, except that— ...

. . . .

**(2) Transactions disregarded; best evidence**

For the purposes of this subsection, a transaction directly or indirectly between . . . [related parties [3]] may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise under consideration. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not . . . [related].

**(3) Special rule**

If, regarding any transaction between . . . [related parties] involving the production by one of such persons of a major input to the merchandise under consideration, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the costs of production of such input, then the administering authority may determine the value of the major input on the best evidence available regarding such costs of production, if such costs are greater than the amount that would be determined for such input under paragraph (2).

19 U.S.C. § 1677b(e).

NSK's contention that § 1677b(e)(3) limits Commerce's ability to request cost data is not supported by the statute or the legislative history. Section 1677b(e)(2) grants Commerce the authority to request information concerning "any element of value re-

quired to be considered." If based on the information considered, Commerce finds that transfer prices do not "fairly reflect the amount usually reflected in sales in the market under consideration," then Commerce may disregard these transactions in favor of the best evidence available if "there are no other transactions available for consideration." 19 U.S.C. § 1677b(e)(2). Section 1677b(e)(2) does not contain language limiting what Commerce may use as best evidence available. In addition, this Court has held that pursuant to 19 U.S.C. § 1677b(e)(2), Commerce has "the discretion to disregard transfer prices, if the respondent cannot demonstrate that such prices are consistent with arm's-length prices." *SKF USA Inc. v. United States*, 19 CIT ——, ——, 888 F.Supp. 152, 156 (1995). The Court noted that the statute only applies if the respondent reported or relied upon transfer prices. *SKF*, 19 CIT at ——, 888 F.Supp. at 156. As Commerce suggests, 19 U.S.C. § 1677b(e)(2) provides a basis for Commerce to request cost data about parts purchased from related suppliers as long as the respondents reported or relied on transfer prices. Thus, 19 U.S.C. § 1677b(e)(2) applies in the case at bar because NSK reported transfer prices in its "Section D" questionnaire response.[4] *See Response of NSK Ltd. and NSK Corporation to Section D of the Questionnaire* ("*Section D Response*"), C.R.Document No. 63, Fiche 274, Frames 75–76.

In addition, § 1677b(e)(3) does not limit Commerce's authority to request COP data pursuant to § 1677b(e)(2). While the effect of § 1677b(e)(3) on Commerce's authority to request COP data seems unclear from the language of the statute, the legislative history clarifies the issue:

> percent or more of the outstanding voting stock or shares of any organization and such organization.
> (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

---

**3.** 19 U.S.C. § 1677b(e)(4) defines related parties as follows:
 The persons referred to in paragraphs (2) and (3) of this subsection are:
 (A) Members of a family. . . .
 (B) Any officer or director of an organization and such organization.
 (C) Partners.
 (D) Employer and employee.
 (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5

**4.** The confidential record of this administrative review is designated "C.R." The public record of this administrative review is designated "P.R."

The amendment provides that *if the Commerce Department has reasonable grounds to believe or suspect* that the amount representing the value of a major input which is provided by a related party ("transfer price") is less than the related party's costs of producing such major input, *then Commerce may base the value of such input on the best evidence available* as to its costs of production when such costs are greater than the price that would be used as a result of the application of paragraph (2) ("arm's-length price").

The conferees expect that, if petitioner makes a bona fide allegation that the transfer price for the major input or the arms-length price is less than the related party's costs of production, then Commerce will investigate such claims and may request cost-of-production information from the related party seller of the input.

H.R.Conf.Rep. No. 576, 100th Cong., 2d Sess. 595, *reprinted in* 1988 U.S.C.C.A.N. 1547, 1628 (emphasis added). The above passage emphasizes that the purpose of § 1677b(e)(3) is to permit Commerce to use best evidence available when it has reasonable grounds to suspect below cost sales occurred. There is no support in the legislative history of § 1677b(e)(3) for the claim that Commerce may not request COP data for other purposes.[5]

In response to the above interpretation of the statute, NSK claims that in the Final Results Commerce relied on § 1677b(e)(3) and not § 1677b(e)(2). *NSK's Reply Brief* at 10–11. NSK's excerpt from the Final Results conveniently omits Commerce's citation to § 773(e)(2) of the Tariff Act which is codified at 19 U.S.C. § 1677b(e)(2). *See id.; Compare Final Results,* 58 Fed.Reg. at 39,-754. Thus, Commerce appropriately sought cost data pursuant to 19 U.S.C. § 1677b(e)(2).

■ NSK's failure to provide the requested information justified Commerce's use of BIA. Section 1677e(c) of Title 19, United States Code, states that Commerce "shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." In addition, Commerce's regulations instruct the Secretary to use BIA whenever Commerce:

(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or

(2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

19 C.F.R. § 353.37(a) (1993).

By its own admission, NSK did not provide Commerce with complete information. Commerce requested the following information in a supplemental questionnaire:

Please demonstrate, for *each* related supplier of components, the manner in which you determined that the prices of components purchased represented fair market prices. In your response, please show your "arm's-length" test for those components purchased from both related and unrelated parties, and state the quantities purchased from each. Further, for those products purchased from related suppliers at less than "arms-length" prices, please adjust the prices paid to the related suppliers to reflect fair market prices.

*Response of NSK Ltd. and NSK Corporation to Supplemental Questionnaire for Sections D and E* ("*Supplemental Questionnaire Response* "), P.R.Document No. 378, Fiche 130–31, Frame 95. NSK acknowledged within its response that the answers were not complete: "NSK Ltd. cannot otherwise directly respond to the Department's question be-

---

**5.** NSK's reliance on 19 U.S.C. § 1677b(b) is misplaced. The fact that "reasonable grounds to believe or suspect" carries the same meaning for both sections is irrelevant. The purpose of § 1677b(b) is to require Commerce to investigate below cost sales when there is evidence that such sales did in fact occur. The issue that the courts have focused upon is whether domestic industry has produced enough evidence to require Com-

merce to determine whether such sales were made. *See generally Al Tech,* 6 CIT at 246–50, 575 F.Supp. at 1279–82; *Torrington Co. v. United States,* 15 CIT 456, 458–61, 772 F.Supp. 1284, 1286–89 (1991). The issue is not whether Commerce *can* conduct such investigations but, instead, whether Commerce *must* do so. The analysis of this issue has no bearing on the meaning of § 1677b(e)(3).

cause it seldom purchases identical components from both related and unrelated parties." *Supplemental Questionnaire Response,* P.R.Document No. 378, Fiche 130–31, Frame 96. NSK does not explain why it cannot supply information concerning the few occasions in which it does purchase identical components from both related and unrelated suppliers. Moreover, Commerce did not limit its inquiry in the original questionnaire to "identical" components but, rather, requested information concerning "identical or similar input." *Section D Response,* P.R. Document No. 212, Fiche 95, Frame 95. Similarly, the Supplemental Questionnaire does not limit its request to information concerning identical components. *See Supplemental Questionnaire Response,* P.R.Document No. 378, Fiche 130–31, Frame 95. As such, NSK's response lacks an explanation concerning similar components purchased from related and unrelated suppliers. Instead, NSK provides a detailed explanation of why Commerce "must" defer to Japanese law. *Id.*

NSK's unilateral decision that Japanese law obviated the need for a complete and accurate response to Commerce's questionnaires is not sufficient to avoid the application of BIA. In *Ansaldo Componenti, S.p.A. v. United States,* 10 CIT 28, 37, 628 F.Supp. 198, 205 (1986), the court stated: "It is Commerce, not the respondent, that determines what information is to be provided for an administrative review." Furthermore, NSK's reliance on *NTN Bearing Corp. of America v. United States,* 17 CIT 713, 719–20, 826 F.Supp. 1435, 1440–41 (1993), is misplaced. In *NTN* the respondent submitted complete responses to all questionnaires and Commerce failed to ask for the appropriate clarifications. *NTN,* 17 CIT at 719–20, 826 F.Supp. at 1441. In the case at bar, Commerce clearly asked for further information and did not receive a complete response.

■ Furthermore, Commerce's use of BIA as opposed to the best evidence available was proper and consistent with its practice. Section 1677b(e) authorizes the use of the best evidence available when a respondent has failed to demonstrate the existence of arm's-length transfer prices. As demonstrated in the above discussion, NSK failed to submit

information that would help Commerce determine whether the prices paid for related party inputs were at arm's length. NSK also failed to produce requested COP data which could have been used as the best evidence available. As such, Commerce properly resorted to BIA pursuant to 19 U.S.C. § 1677e(c).

■ The Court agrees with NSK, however, that Commerce improperly applied BIA to finished bearings purchased from related suppliers. In the original questionnaire, Commerce requested cost information for each "component, *e.g.,* inner rim, outer rim" purchased from related and unrelated suppliers. *July 30, 1992 Questionnaire ("Questionnaire"),* P.R.Document No. 2, Fiche 1, Frame 2. Commerce's reliance on the word "product" in the Supplemental Questionnaire Response is unpersuasive. The first two sentences of the paragraph ask for a demonstration of the existence of arm's-length prices for the purchase of "components." The third sentence merely requests that NSK adjust prices for those "products" not purchased at arm's-length prices. It would not make sense for Commerce to request cost information concerning "components," but require NSK to adjust prices for below cost sales of only finished bearings.

■ Commerce's argument concerning its statutory interpretation of "elements of value" is equally unpersuasive. If Commerce interprets "elements of value" to include finished bearings, then it should convey this clearly in its questionnaire by requesting information about finished bearings. Respondents should not be required to guess the parameters of Commerce's interpretation of a phrase in the statute. Thus, Commerce improperly applied BIA to finished bearings since the lack of such information was due to Commerce's failure to request it rather than NSK's failure to supply it. Accordingly, this issue is remanded to Commerce to calculate the constructed value for all finished bearings purchased from related suppliers based on data submitted by NSK.

Finally, as both NSK and Commerce agree that Commerce mistakenly applied BIA to parts purchased exclusively from unrelated

suppliers, the Court finds that a remand to Commerce is necessary to correct the error.

In sum, the Court finds that Commerce's rejection of NSK's related party transfer prices in favor of BIA in calculating FMV was in accordance with law. The Court remands for Commerce to calculate the constructed value for all finished bearings purchased from related suppliers based on data submitted by NSK, and to correct the clerical error concerning the application of BIA to parts purchased exclusively from unrelated suppliers.

### 2. Home Market Levels of Trade

■ In the Final Results of this review, Commerce determined that NSK bearings are sold in the home market in either one of two levels of trade: (1) original equipment manufacturers ("OEMs") and (2) distributors. *Final Results,* 58 Fed.Reg. at 39,767. NSK objects to Commerce's use of customer categories to determine home market levels of trade. *NSK's Brief* at 39–40. NSK points out that 19 C.F.R. § 353.58 (1993) requires Commerce to " 'calculate foreign market value and United States price based on sales at the same *commercial* level of trade.' " *NSK's Brief* at 39 (quoting 19 C.F.R. § 353.58 (emphasis added)). According to NSK, customer categories do not adequately represent commercial realities. *NSK's Brief* at 39. NSK concludes that Commerce should have used the aftermarket variable instead of the customer category variable to determine the home market levels of trade. *Id.* at 40.

In rebuttal, Commerce explains that if it finds that different levels of trade exist, then Commerce presumes that net sales price and selling expenses and, therefore, FMV are different at each level of trade. *Commerce's Brief* at 27. In such a situation, Commerce will only compare sales at comparable levels of trade if possible. *Id.* at 27–28. Commerce states that this presumption may be rebutted by evidence that sales prices and expenses do not vary with level of trade. *Id.* at 28. Accordingly, Commerce responds that it properly focused upon customer category rather than aftermarket use because NSK did not present any evidence that OEMs or

distributors perform different functions depending upon the aftermarket use for which they purchase bearings. *Id.* According to Commerce, the customer code system used by NSK only identifies the type of aftermarket use of the bearings and does not explain how the functions of OEMs differ depending upon the aftermarket use of the bearings. *Id.* at 29. Commerce also rejects NSK's attempt to demonstrate price correlations between weighted average prices and aftermarket uses as insufficient proof of the existence of different levels of trade according to end use. *Id.* at 31.

Federal–Mogul and Torrington essentially support Commerce's decision to use customer categories to determine levels of trade. *See Federal–Mogul's Brief* at 19–23; *Torrington's Brief* at 28–35.

■ Pursuant to 19 C.F.R. § 353.58, Commerce "normally will calculate foreign market value and United States price based on sales at the same commercial level of trade." Commerce is required to make comparisons at a "specific, 'common' point in the chain of commerce, so that value can be fairly compared on an equivalent basis." *Smith–Corona Group v. United States,* 713 F.2d 1568, 1572 (Fed.Cir.1983). In *NSK Ltd. v. United States,* 17 CIT 590, 596, 825 F.Supp. 315, 321 (1993), the Court acknowledged that it is "well-established ... that the respondent has the burden of proving Commerce's alleged error" (relying on *Timken Co. v. United States,* 11 CIT 786, 804, 673 F.Supp. 495, 513 (1987)). In *NSK,* the plaintiff claimed that Commerce erred by not treating sales to OEMs of replacement bearings for use in their own production equipment as aftermarket sales. In affirming Commerce's determination, the Court found that the plaintiff had not satisfied its burden of proof. *NSK,* 17 CIT at 596, 825 F.Supp. at 321. Thus, NSK bears the burden of proving that Commerce inappropriately used customer categories instead of aftermarket variables to determine levels of trade.

In a bulletin, Commerce stated its methodology for determining levels of trade as follows:

In asking for LOT [level of trade] information, the Department is trying to determine where in the distribution chain the respondent's customer falls (end user, distributer, retailer). The presumption is that the net price and/or selling expenses and, therefore, the foreign market value (FMV) are different at each LOT. Therefore, it appears reasonable to match at LOT if the different customer categories have different functions. In other words, if the respondent reports LOT with distinct, discernible functions, the Department will, when possible, make matches at the same level of trade, unless there is evidence to rebut the assumption that FMV is affected by LOT.

The next question is, how can parties rebut the underlying assumption? In the past the Department has articulated a price correlation test and has been upheld in the courts. *Upon further consideration we find that the test should encompass both prices and selling expenses, because selling expenses also affect the foreign market value. Therefore, only if a contesting party has shown that there is not a significant correlation between prices and selling expenses on the one hand, and levels of trade on the other, will we disregard the level of trade when making sales comparisons in cases where different functional levels of trade exist.*

*Import Administration Policy Bulletin 92/1,* July 29, 1992 ("*Policy Bulletin*") (emphasis added). This Policy Bulletin, which was issued before the questionnaire, clearly notified respondents of the need to produce specific prices and selling expenses to rebut the presumption that FMV is different at each level of trade. In order for NSK to prevail, NSK's assertion that Commerce should have used the aftermarket variable must be supported by evidence that selling prices and expenses for bearings vary according to aftermarket use.

In the Final Results, Commerce stated the following about its decision to use customer categories:

[W]e focus on the customer's function in the chain of distribution in classifying sales according to level of trade. We do not consider the end use of products sold by the respondent's customer to be particularly meaningful in determining levels of trade. *NSK has not presented any evidence that original equipment manufacturers perform different functions or that distributors perform different functions depending upon the end use of the bearings they purchase, or that NSK's selling expenses differ according to the end use of the products by the customer.* Therefore, for these final results, we have based our level-of-trade classifications not on NSK's aftermarket codes, but on customer categories reported by NSK.

*Final Results,* 58 Fed.Reg. at 39,767 (emphasis added). There is no evidence on the record to contradict this finding by Commerce. While NSK did submit price information, it failed to submit any information concerning selling expenses. *See Response of NSK Ltd. and NSK Corporation to Supplemental Questionnaire for Sections A through C, and Computer Tapes Related Thereto,* C.R.Document No. 106, Fiche 298, Frame 18; Exhibits A–31, A–32, C.R.Document No. 106, Fiche 298, Frames 34–40. Assuming, *arguendo,* that the price information submitted by NSK was sufficient to demonstrate a significant correlation between prices and levels of trade, this would still be insufficient to meet the requirements set forth by Commerce. NSK did not produce any evidence demonstrating a correlation between selling expenses and levels of trade. Thus, Commerce's decision to rely on the customer codes as opposed to the aftermarket variables was reasonable and supported by substantial evidence on the agency record.

3. *Classification of Discounts and Rebates*

■ In this review, Commerce treated discounts and rebates that were reported on a customer-specific or product-specific basis, rather than on a transaction-specific basis, as indirect selling expenses. *Final Results,* 58 Fed.Reg. at 39,759. NSK claims that Commerce improperly classified NSK's post-sale price adjustment rebates and stock transfer commissions as indirect selling expenses. *NSK's Brief* at 41–42. NSK contends that a post-sale price adjustment rebate is not a general sales activity since it is incurred only

when "specific sales of specific part numbers are made to specific customers." *Id.* at 42. While NSK acknowledges that post-sale price adjustments are not incurred on a single-transaction basis, NSK maintains that post-sale price adjustments are directly related to each individual sale. *Id.* at 43. NSK also asserts that Commerce's treatment of post-sale price adjustment rebates was inconsistent with earlier reviews and the preliminary results of the review at issue. *Id.* at 45. NSK further claims that its stock transfer commissions conform to Commerce's definition of direct expenses since the commission rate is a fixed percentage for all products and distributors. *Id.* at 44.

In rebuttal, Commerce asserts that its treatment of rebates and discounts was consistent with the policy it established in the prior review. *Commerce's Brief* at 32–33. According to Commerce, permitting the allocation of discounts or price adjustments to all sales would distort the actual prices for each specific sale. *Id.* at 33. Commerce claims that the only exception to its general rule against the allocation of discounts was for customer-specific allocations which were to be treated as indirect expenses. *Id.* at 34.

Commerce argues that in spite of NSK's claims to the contrary, NSK reported its post-sale price adjustment rebates on a customer-specific basis as opposed to a transaction-specific basis. *Id.* at 34–35. Commerce contends that at verification, it verified that NSK calculated post-sale price adjustment rebates on a customer-specific basis. *Id.* at 35. Commerce further responds that NSK allocated the stock commissions across all sales by distributors to whom it paid commissions rather than according to whether a particular transaction involved a commission. *Id.* Finally, Commerce cites *Torrington Co. v. United States*, 17 CIT 672, 683–84, 832 F.Supp. 365, 375–376 (1993), in support of its claim that the Court has upheld Commerce's treatment of allocated discounts and rebates as indirect selling expenses in order to encourage transaction-specific reporting of discount and rebate data. *Commerce's Brief* at 36.

Federal–Mogul and Torrington agree with Commerce that its treatment of post-sale

price adjustment rebates and stock transfer commissions as indirect expenses is supported by substantial evidence on the agency record and in accordance with law. *Federal–Mogul's Brief* at 23–25; *Torrington's Brief* at 36–41.

In *Torrington,* 17 CIT at 683–84, 832 F.Supp. at 375–376, this Court upheld Commerce's practice of treating allocated home market expenses as indirect expenses. The Court noted, however, that there are occasions where Commerce will deduct discounts from FMV:

> [D]iscounts can be deducted from FMV if the actual expense information is reported to the ITA on a transaction-specific or product-specific basis. 19 U.S.C. § 1677b(a)(4)(B). It is also clear that discounts paid on the subject merchandise can be allocated over all sales of the subject merchandise as long as discounts paid only on the subject merchandise are used to calculate the per-unit amount of discount to be deducted and the discounts "can be directly correlated with specific merchandise using verified cost and sales information." *If a respondent is unable to provide the ITA with transaction-specific or product-specific discount amounts, the ITA must look to the information provided by the respondent to determine if the reported allocated discounts were only made on and allocated to sales of the subject merchandise and can be tied to verified cost and sales data. In order for the ITA to accept discounts or rebates allocated on a customer-specific basis as direct costs, the percentage amount of each discount or rebate paid must be the same for each type of the subject merchandise sold and the total amount of discounts or rebates paid to each customer must be allocated over all sales of the subject merchandise made to that customer. If this relationship is not shown to the satisfaction of the ITA, but the aggregate amounts of discounts paid on the subject merchandise have been verified, the discounts are to be treated as indirect selling expenses.*

*Torrington,* 17 CIT at 684, 832 F.Supp. at 376 (quoting *Smith Corona,* 713 F.2d at 1580 (emphasis added)). Following the analysis in

*Torrington,* the Court has held that Commerce properly treated post-sale price adjustments as indirect expenses where the "discounts differed between sales to the same customers." *NSK Ltd. v. United States,* 19 CIT ——, ——, 896 F.Supp. 1263, 1274 (1995) (relying on *Koyo Seiko Co. v. United States,* 16 CIT 539, 542–43, 796 F.Supp. 1526, 1530 (1992)).

NSK's reporting of post-sale price adjustments does not meet the standard set forth in *Torrington* to qualify as a direct selling expense. NSK determined the amount of a rebate by "negotiat[ing] a price reduction covering the customer's specific purchase" based "on the amount of competition in the marketplace, and the loyalty of the customer." *NSK's Brief* at 43. In its "Section C" questionnaire response NSK reported these rebates as follows:

> NSK Ltd. adjusted the selling price to certain customers and applied the price reductions retroactively on a part-by-part and customer-by-customer basis.... NSK Ltd. divided the adjustment per part number sold to a customer by NSK Ltd.'s *total sales* of that part number to the specific customer in order to obtain the percentage reported. NSK Ltd. then multiplied the percentage by the selling unit price.

*Response of NSK Ltd. and NSK Corporation to Section C of the Questionnaire ("Section C Response "),* P.R. Document No. 178, Fiche 76–77, Frames 16–17 (emphasis added). Commerce verified that "NSK calculated [post-sale price adjustments] by allocating customer-and part-specific adjustments over the original customer- and part-specific sales value, and then multiplying the resulting ratio by the original per-unit price, as reported in the response." *Verification of Questionnaire Responses Submitted by NSK Ltd. and NSK Corporation in the Third Review,* P.R. Document No. 424, Fiche 139–40, Frame 4. NSK individually negotiated each rebate and, therefore, the same customers received different discounts depending upon the conditions surrounding a particular sale. Furthermore, while NSK links the adjustments to customers and parts, it does not link the adjustments to the particular sales involved.

NSK multiplied the resulting percentage by the selling unit price, but there is no evidence that NSK conducted this calculation with respect to only those transactions involving the sales in which post-sale price adjustments were applied. Therefore, Commerce properly treated these rebates as indirect selling expenses.

The stock transfer commissions satisfy the first requirement of *Torrington,* that the rate be constant for all sales. However, in its Section C Response, NSK stated that it "allocated commissions to the specific distributors to whom it paid commissions" and then "divided the commissions paid by its sales to the distributor during the fiscal year." P.R. Document No. 178, Fiche 76–77, Frames 26–27. Similar to the reporting of the post-sale price adjustments, there is no evidence linking the commissions to particular sales since NSK divided the commissions by all sales to that distributor regardless of whether the particular sales involved commissions. Thus, NSK failed to meet the criteria set forth in *Torrington,* and Commerce's treatment of the commissions as indirect selling expenses was in accordance with law.

### 4. *United States Repacking Expenses*

▇▇ NSK claims that Commerce erred by including material costs incurred by NSK for repacking finished products in the United States in NSK's further manufacturing costs. *NSK's Brief* at 45–46. NSK explains that it reported repackaging expenses in its response to "Section B" of the questionnaire under the variable USPACKME. *Id.* at 19. NSK further claims that NSK reported packaging material costs for further manufactured products in its "Section E" response under the variable ECOPAM which includes "*all* material costs related to U.S. further manufactured bearings." *Id.* at 46. According to NSK, repacking expenses for finished products are incurred at NSK's warehouse and, therefore, distinguishable from packing costs for further manufactured products. *Id.* at 45–46. NSK concludes that it was improper for Commerce to add USPACKME to further manufacturing costs. *Id.* at 46.

In response, Commerce claims that NSK failed to follow the instructions contained in

"Section E" of the questionnaire by including packing expenses in its "Section E" response under the ECOPAM variable. *Commerce's Brief* at 38. Commerce contends that based on the information submitted by NSK it could not determine whether all of the packing costs associated with further manufacturing were included in the ECOPAM variable. *Id.* at 38–39. In light of its inability to confirm that all further manufacturing packing expenses were included in the ECOPAM variable, Commerce contends that it was reasonable to add the packing costs reported in the USPACKME variable in "Section B" of the questionnaire to the further manufacturing cost calculation. *Id.* at 39.

Federal–Mogul and Torrington both support Commerce's decision to include United States packing expenses in calculating further manufacturing costs. *Federal–Mogul's Brief* at 25–27; *Torrington's Brief* at 42–46.

"Section B" of the questionnaire contained the following instructions concerning the reporting of packing material:

> Describe packing materials used. Include and describe additional materials if merchandise is repacked in the U.S. or TC. Report any U.S. repacking expenses separately by adding additional variables, US-PACKME and USPACKLE, respectively. . . .
> Report labor costs. Include additional labor if merchandise is repacked in the U.S. or the TC. Report any U.S. repacking expenses separately by adding additional variables, USPACKME and USPACKLE, respectively.

*Response of NSK Ltd. and NSK Corporation to Section B of the Questionnaire ("Section B Response")*, P.R. Document No. 143, Fiche 62, Frames 98, 2. In response, NSK reported its packing expenses as follows:

> The merchandise is normally shipped from the U.S. warehouse in its original containers. In some instances, different pallets were used for shipment to U.S. customers and some repackaging may occur to accommodate smaller distributor orders. The cost of repackaging supplies have been separately identified and allocated among such sales for the review period under USPACKME.

*Section B Response*, P.R. Document No. 143, Fiche 62, Frame 1.

"Section E" of the questionnaire instructed that "[a]ll packing and transportation expenses should be reported in [the] response to Section B (U.S. Sales)" and that the respondents "need not repeat that information in [the] response to this section of the questionnaire." *Questionnaire*, P.R. Document No. 2, Fiche 1, Frame 21. NSK's response was the following:

> Primary packing costs, including the cardboard boxes and cartons into which bearings are packed, are included in NSK's burden calculation. See Proprietary Exhibits E–17 and E–18. The labor costs associated with the packing of boxes and cartons, also are included in the burden calculation and allocated to the products produced. Secondary packing costs, which are incurred outside the manufacturing plant, are captured in NSK's September 28, 1992, Response to Section B, selling expenses.

*Response of NSK Ltd. and NSK Corporation to Section E of the Questionnaire ("Section E Response")*, P.R. Document No. 207, Fiche 93–94, Frame 5.

In the Final Results, Commerce explained its reasons for including the USPACKME variable in the further manufacturing cost calculation:

> The Department's further manufacturing questionnaire informs respondents that they should not report packing expenses because the Department will rely on the packing expense data reported in respondents' U.S. sales response. Although NSK claims that packing expenses incurred in the United States for further manufactured products are reported in its further manufacturing calculations, we are unable to confirm that this is the case. Because we instructed NSK to rely on previously reported packing data for purposes of our further manufacturing calculations, and because we cannot confirm NSK's claim that packing expenses are already included in further manufacturing costs, we have not made an adjustment to the further manufacturing that NSK reported in its U.S.

sales response in our further manufacturing calculations for these final results. *Final Results*, 58 Fed.Reg. at 39,766.

The Court is of the opinion that Commerce's actions were reasonable and consistent with law. Commerce clearly asked respondents to report all packing and transportation expenses in "Section B" of the questionnaire. NSK failed to follow these instructions and chose to split the reporting of these expenses between "Section B" and "Section E" of the questionnaire. NSK's Section E Response acknowledges that some of the packing costs, "secondary packing costs," were reported in "Section B." Therefore, it was reasonable for Commerce to add the packing costs contained in the US-PACKME variable reported in "Section B" to the further manufacturing costs included in the ECOPAM variable reported in "Section E."

### 5. *Deduction of Further Manufacturing Expenses*

 In this review, Commerce required a further manufacturing analysis for NSK's imported parts. *Final Results*, 58 Fed.Reg. at 39,766. NSK contends that Commerce's actions were inconsistent with 19 U.S.C. § 1677a(e)(3) (1988)[6] which instructs Commerce to reduce exporter's sales price ("ESP") by the value of further processing performed in the United States if " 'the product ultimately sold to an unrelated purchaser contains a *significant* amount by quantity or value of the imported product.' " *NSK's Brief* at 46 (quoting S.Rep. No. 1298, 93d Cong.2d Sess. 172–73, *reprinted in* 1974 U.S.C.C.A.N. 7186, 7310 (emphasis added)). NSK also submits that Commerce did not properly apply the "Roller Chain"[7] exception. *NSK's Brief* at 47. NSK asserts that Commerce's requirement of further manufacturing data on all imported parts where the entered value of such parts was more than

one percent of the selling price of the finished non-scope product, and all imported parts which were incorporated into finished scope products, is not in accordance with law. *Id.* According to NSK, Commerce is required to consider the quantitative and qualitative significance of imported parts in further processed merchandise. *Id.* NSK maintains that if Commerce had considered qualitative factors, it would have determined that the imported parts at issue were insignificant. *Id.* at 49. NSK further argues that Commerce's approach constitutes rule-making which requires the promulgation of a rule in accordance with the Administrative Procedures Act. *Id.* at 48.

Commerce responds that it "is merely applying the intent of Congress as clearly expressed in the legislative history of 19 U.S.C. § 1677a(e)(3)." *Commerce's Brief* at 52. Commerce claims that the one percent threshold is interpretative of the term "insignificant amount" and, therefore, is an "interpretive rule" which does not require notice and comment. *Id.* (relying on *Timken Co. v. United States*, 11 CIT 786, 805–06, 673 F.Supp. 495, 513–15 (1987)). Commerce further claims that it was reasonable to only consider the cost of the input and of the finished merchandise as opposed to "qualitative" factors. *Commerce's Brief* at 53. In addition, Commerce submits that its decision to apply the "Roller Chain" exclusion to only non-scope finished products was consistent with Congress' intentions. *Id.*

The Court has already upheld Commerce's further manufacturing analysis as applied in the second administrative review of NSK as being consistent with law. *See NSK*, 19 CIT at ——, 896 F.Supp. at 1268–71. *See also Koyo Seiko Co. v. United States*, 19 CIT ——, ——, 898 F.Supp. 915, 920 (1995). Therefore, the Court will not further consider NSK's arguments as it finds that Com-

---

**6.** 19 U.S.C. § 1677a(e)(3) instructs Commerce to reduce the exporter's sales price by the amount of "any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise."

**7.** Imports of scope merchandise are not subject to antidumping duties if they comprise an insignificant amount of the sales value of the finished product sold to unrelated customers in the United States. *See Roller Chain, Other Than Bicycle, From Japan; Final Results of Administrative Review of Antidumping Finding*, 48 Fed.Reg. 51,-801, 51,804 (Nov. 14, 1983).

merce's actions in the review at bar were reasonable and supported by law.

### 6. Clerical Errors

NSK contends that Commerce committed two clerical errors. First, NSK requests a remand so that Commerce can correct a computer programming error which resulted in the failure to reflect that the sample week beginning July 1, 1991 ended on July 7, 1991 rather than on July 7, 1910. *NSK's Brief* at 50. Second, NSK submits a remand is necessary to correct a computer programming error which resulted in the failure to produce family matches. Commerce agrees that a remand is necessary to correct both computer errors. *Commerce's Brief* at 55–56.

Federal–Mogul argues that the second error alleged by NSK is not a clerical error, but, rather, intentional and a result of Commerce's methodology for defining "such or similar merchandise" and finding model matches. *Federal–Mogul's Brief* at 30–31. Federal–Mogul urges the Court to resolve the issue consistent with arguments advanced by Federal–Mogul in its own case pending before the Court that Commerce's methodology is unlawful. *Federal–Mogul's Brief* at 31 (citing *Brief of Federal–Mogul Corporation in Support of its Motion for Judgment Upon the Agency Record*, filed in Consol. Court No. 93–08–00461, at 11–14).

The Court agrees with NSK and Commerce that a remand for the correction of the two clerical errors is necessary. Federal–Mogul's argument is not relevant to the case at bar. Therefore, the Court remands this matter to Commerce to correct the computer program so that it reflects that the sample week beginning on July 1, 1991 ended on July 7, 1991, and to correct the computer program to produce family matches.

### Conclusion

NSK's motion for partial judgment upon the agency record is granted to the extent that this case is remanded to Commerce to (1) calculate the constructed value for all finished bearings purchased from related suppliers; (2) calculate the constructed value for all bearings further manufactured in the United States from parts purchased from unrelated suppliers; (3) correct the clerical error concerning the ending date of the sample week beginning July 1, 1991; and (4) correct the clerical error concerning family matches. Commerce's Final Results, to the extent challenged herein, are sustained in all other respects.

The remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.

### ORDER

This case having been duly submitted for decision following plaintiffs' motion for judgment on the agency record, and the Court, after due deliberation, having rendered a decision herein; now, therefore, in accordance with said decision,

**IT IS HEREBY ORDERED** that plaintiffs' motion is granted to the extent that this case is remanded to the Department of Commerce, International Trade Administration, to calculate the constructed value for all finished bearings purchased from related suppliers and for all bearings further manufactured in the United States with parts purchased exclusively from unrelated suppliers; and it is further

**ORDERED** that Commerce correct the clerical error concerning the ending date of the sample week beginning July 1, 1991 and the clerical error concerning family matches; and it is further

**ORDERED** that Commerce's determination is affirmed in all other respects; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen

(15) days of the date that responses or comments are due.