The TIMKEN COMPANY, Plaintiff and Defendant–Intervenor,

v.

UNITED STATES, Defendant,

NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation; NSK Ltd. and NSK Corporation, Defendant–Intervenors and Plaintiffs,

American Honda Motor Co., Inc., Honda of America Mfg., Inc. and Honda Motor Co., Ltd., Defendant–Intervenor.

Slip Op. 97–164.
Court No. 96–12–02686.

United States Court of International Trade.

Dec. 3, 1997.

Stewart and Stewart (Terence P. Stewart, James R. Cannon. Jr., William A. Fennell, Patrick J. McDonough and David S. Johanson), for plaintiff and defendant-intervenor, Timken.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis); of counsel: Carlos A. Garcia, Attorney–Advisor, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

Barnes, Richardson & Colburn (Donald J. Unger and Kazumune V. Kano) for defendant-intervenor and plaintiff NTN.

Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe and Grace W.

Lawson) for defendant-intervenor and plaintiff NSK.

Gibson, Dunn & Crutcher, LLP (Donald Harrison and Judith A. Lee) for defendant-intervenor Honda.

### OPINION

TSOUCALAS, Senior Judge.

Plaintiff, The Timken Company ("Timken"), brings this action pursuant to Rule 56.2 of the Rules of this Court for judgment upon the agency record contesting the final results the Department of Commerce, International Trade Administration's ("Commerce") final results of the administrative review, entitled *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Finding* ("*Final Results*"), 61 Fed.Reg. 57,-629 (Nov. 7, 1996).

### Background

The administrative review at issue encompasses imports of tapered roller bearings ("TRBs") during the review period of October 1, 1992 through September 30, 1993. On May 5, 1995, Commerce published the preliminary results of the instant review. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Preliminary Results of Antidumping Duty Administrative Reviews, Termination in Part, and Intent to Revoke in Part* ("*Preliminary Results*"), 60 Fed.Reg. 22,349. On November 7, 1996, Commerce published the Final Results at issue. *See Final Results,* 61 Fed.Reg. at 57,629.

Timken claims Commerce erred in: (1) failing to reduce U.S. price by the amount of antidumping duties pursuant to the reimbursement regulation; (2) failing to disregard below-cost sales when calculating profit for constructed value ("CV"); (3) accepting NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation's (collectively "NTN") reported U.S. credit expenses; (4) treating NTN's home market discounts and NSK Ltd. and NSK Corporation's (collectively "NSK") return rebates, post-sale price adjustments ("PSPAs") and lump-sum PSPAs as indirect selling expenses; and (5) revoking the antidumping duty order with respect to American Honda Motor Co., Inc., Honda of America Mfg., Inc. and Honda Motor Co., Ltd. (collectively "Honda").

Defendant-intervenor and plaintiff, NSK, asserts Commerce erred in: (1) treating NSK's return rebates and PSPAs as indirect, rather than direct, expenses; (2) denying adjustments to foreign market value for distributor incentives, performance incentive rebates and stock transfer commissions; (3) using NSK's submitted related-party cost information for calculating foreign market value ("FMV") rather than using the related-party transfer prices when the cost of production ("COP") for the input exceeded the transfer price that NSK reported for the input; (4) improperly including samples in the U.S. sales database; and (5) failing to rely on COP that NSK's suppliers submitted for the below-cost test for inputs from related suppliers.

Defendant-intervenor and plaintiff, NTN, argues Commerce erred in: (1) treating certain home market discounts as indirect selling expenses; (2) treating NTN's related party commission payments as an indirect selling expense in purchase price transactions and deducting the amount from NTN's U.S. indirect selling expenses for exporter's sales price ("ESP") sales; (3) recalculating NTN's selling expenses based on level of trade; (4) denying NTN's claimed offset for interest expenses incurred in financing cash deposits of estimated antidumping duties; (5) applying one average rate to adjust further manufacturing calculations and CV for inputs NTN obtained from a related party; (6) refusing to make a level of trade adjustment for NTN based on the full difference in prices between levels of trade; and (7) splitting the prices of "unsplittable" TRBs.

### Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

■ The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on the grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

1. *Absorption of Antidumping Duties by U.S. Importers Affiliated with Foreign Producers*

Timken contends Commerce improperly failed to reduce U.S. price by the amount of antidumping duties absorbed by U.S. importers affiliated with foreign producers under 19 U.S.C. § 1677a(d)(2)(A) (1988). Timken's Mem. Supp. Mot. J. Agency R. at 15–16. While Timken recognizes that the Court decided this same issue against Timken's current position in *Torrington Co. v. United States*, 19 CIT ——, ——, 881 F.Supp. 622, 631–32 (1995), Timken believes the Court's reasoning is contrary to the statutory language stating that U.S. price shall be reduced by "*any* additional costs, charges, and expenses, and United States import duties." *Id.* (citing 19 U.S.C. § 1677a(d)(2)(A) (emphasis added)). In the alternative, Timken argues Commerce should deduct reimbursed duties from ESP pursuant to the reimbursement regulation, 19 C.F.R. § 353.26(a) (1994). *Id.* at 16–19.

Commerce responds that it properly did not deduct "absorbed" antidumping duties from U.S. price either as selling expenses or under the reimbursement regulation and claims the statutory language and current case law support its position. Def.'s Partial Opp'n to Mots. J. Agency R. at 13–19. NSK

agrees generally with the position taken by Commerce. NSK's Opp'n to Timken's Mot. J. Agency R. at 7–10.

In *Torrington*, 19 CIT at ——, 881 F.Supp. at 631–32, the Court held that for the reimbursement regulation to apply, a petitioner must present evidence beyond a mere allegation that the foreign manufacturer either paid the antidumping duty on behalf of the U.S. affiliate importer or reimbursed the U.S. affiliate importer for its payment of antidumping duties, *i.e.*, evidence of a link between intracorporate transfers and the reimbursement of antidumping duties. *See also Torrington Co. v. United States*, 20 CIT ——, ——, 944 F.Supp. 930, 933–34 (1996); *Federal–Mogul Corp. v. United States*, 19 CIT ——, ——, 918 F.Supp. 386, 393–94 (1996). The Court of Appeals for the Federal Circuit ("CAFC") recently affirmed *Torrington*, 19 CIT ——, 881 F.Supp. 622, stating that "Commerce has reasonably interpreted and applied its regulation to require some concrete link between below-cost transfers and antidumping duties before automatically assuming or undertaking an investigation to determine that a foreign producer is compensating an importer for the effects of duties." *See Torrington Co. v. United States*, 127 F.3d 1077, 1081 (Fed.Cir.1997).

■ First, the statute and its legislative history contain no language indicating that antidumping duties are to be considered costs for purposes of U.S. price. Moreover, in light of the CAFC's ruling upholding this Court's consistent position in *Torrington* and its progeny, the Court refuses to reconsider its stance on Timken's suggested employment of the reimbursement regulation. Because Timken has presented no evidence demonstrating that U.S. affiliates absorbed the antidumping duties as a cost of selling in the U.S. and because Timken has not made the requisite demonstration for the reimbursement regulation to apply in this case, the Court sustains Commerce's decision not to deduct paid antidumping duties from U.S. price.

### 2. Treatment of Home Market Below–Cost Sales When Calculating CV

Timken claims Commerce improperly included certain below-cost sales in its determination of CV profit because 19 U.S.C. § 1677b(b) (1988) explicitly directs Commerce to disregard below-cost sales in all FMV situations when certain conditions are met. Timken further supports its cause by alleging Commerce's position conflicts with the statutory scheme, as sales below cost are undoubtedly outside the concept of "ordinary course of trade." Timken's Mem. Supp. Mot. J. Agency R. at 23–26. Finally, Timken contends Commerce's position creates an anomaly in the law, contradicts a prior U.S. Government position and defeats the purpose of the antidumping law. *Id.* at 26–30.

Commerce first responds that its statutory interpretation is supported by the language of the statute. Commerce clarifies that its decision is in accordance with the relevant law during the review at issue by restating its explanation in the Final Results: "While we recognize that section 771(15) of the URAA requires the exclusion of [below-cost] sales from our CV profit calculation, these TRB reviews, which were initiated prior to January 1, 1995, are being conducted pursuant to previous law and regulations." Def.'s Partial Opp'n to Mots. J. Agency R. at 20 (citing 61 Fed.Reg. at 57,643).

Commerce further responds that when 19 U.S.C. § 1677b(b) is read in its entirety, the logical conclusion is that Congress intended that below-cost sales be disregarded only in determining *price*-based, as opposed to CV-based, FMV. Finally, Commerce maintains this Court has already recognized that below-cost sales are to be excluded in calculating profit only when they are outside the ordinary course of trade, which requires a determination based on consideration of all relevant circumstances. *Id.* at 20–27.

NTN agrees with the position taken by Commerce, emphasizing that the Court has addressed and rejected Timken's position that below-cost sales are inherently outside the ordinary course of trade. NTN's Opp'n to Timken's Mot. J. Agency R. at 4.

In *Torrington,* 19 CIT at ——, 881 F.Supp. at 633, the Court addressed this same issue, stating that "nowhere does the statute require the exclusion of below cost sales when determining the profit amount in calculating constructed value," and deciding that Commerce may include sales made below cost unless a petitioner demonstrates that such sales were made outside the ordinary course of trade. The Court has continued to follow this position. *See, e.g., Torrington Co. v. United States,* 21 CIT ——, ——, 960 F.Supp. 339, 343 (1997); *INA Walzlager Schaeffler KG v. United States,* 21 CIT——, ——, 957 F.Supp. 251, 270–71 (1997). The CAFC recently affirmed this Court's decision in *Torrington,* 19 CIT at ——, 881 F.Supp. at 632–33. *See Torrington,* 127 F.3d at 1081. The court emphasized that "an enterprise may indeed make some sales below cost in the 'ordinary course of trade,'" as defined in 19 U.S.C. § 1677(15), and concluded that "[w]ithout any record evidence showing that the below-cost sales in this case were outside the 'ordinary course of trade,' Commerce correctly included these sales in its FMV calculation" under section 1677b(e). *Id.* The CAFC further noted that, under 19 U.S.C. § 1677b(b), it "would be illogical to 'employ the constructed value' when '[below-cost] sales are disregarded'" if below-cost sales are also disregarded when calculating constructed value." *Id.,* 127 F.3d 1077, 1081.

In accordance with the CAFC's decision in *Torrington,* the Court concludes that Timken has failed to demonstrate that the below-cost sales at issue were made outside the ordinary course of trade. Commerce's decision to include below cost sales in calculating profit for CV is therefore sustained.

### 3. Acceptance of NTN's Reported U.S. Credit Expenses

Timken claims the amounts of U.S. credit expenses reported by NTN were unrealistic in view of NTN's total U.S. sales and that Commerce, therefore, should resort to the best information available ("BIA"), using as BIA the highest credit expense amount reported for any transaction or a proxy credit expense. In support of its position, Timken

points to five sales from NTN's submitted data and to an analysis Timken performed during the administrative proceedings. Timken further attempts to demonstrate that NTN's calculation of U.S. credit expense was erroneous by calculating the actual credit for four of NTN's ESP sales and comparing that actual credit amount with the reported credit amount. Timken's *Mem. Supp. Mot. J. Agency R.* at 31–33. Finally, Timken suggests Commerce use the information already in the record and simply add a single instruction to its margin program that would calculate actual credit for every U.S. sale. Timken's *Reply Mem. Supp. Mot. J. Agency R.* at 7.

Commerce explains that, in previous reviews, it has verified NTN's reported credit expense amounts, which are based on customer's actual payment information as maintained in NTN's books and records. As NTN has not altered its previous methodology in this review, Commerce states that it properly accepted NTN's reported U.S. credit expense. Furthermore, Commerce claims there is no indication that the five sales Timken selected in its "random sample of observations" are representative of all NTN's sales. Commerce also responds that Timken's allegation that NTN's U.S. credit expense calculation was erroneous is without merit because the four ESP sales Timken selected were not demonstrated to be representative of the many ESP transactions and because each of the sales selected by Timken has a high number of days for which payment was outstanding. *Def.'s Partial Opp'n to Mots. J. Agency R.* at 27–31.

■ First, the use of BIA in this case is entirely inappropriate. Section 1677e(b) requires Commerce to resort to BIA when it cannot verify the accuracy of a respondent's data, when a respondent refuses or is unable to provide information Commerce requests in a timely manner or in the form required, or when a respondent otherwise significantly impedes an investigation. None of these requisite circumstances exist here.

Further, Timken's modified calculation employs a transaction-by-transaction methodology to a few transactions, yielding results that are, of course, different from NTN's results using a customer-specific methodology. *Compare NTN's Questionnaire Response, Section V*, C.R. Doc. No. 14, at 40–41 & Ex. B–8, at worksheet 9, Timken's App., Ex. 8 (March 8, 1994) *with Timken's Admin. Case Brief (Confid.)*, C.R. Doc. No. 107, at 35 & Ex. 4, Timken's Reply App., Ex. 8 (July 21, 1995). Although the reported credit expenses for the five sales Timken selected may constitute a small percentage of the unit price, this does not prove that Commerce erred in accepting NTN's reported costs. As Commerce has verified in previous reviews, NTN's customer-specific methodology of calculating the U.S. credit expense based on the average number of days outstanding for each customer is accurate.

Moreover, the fact that the addition of a single line in the margin program may yield more accurate results does not make unreasonable Commerce's acceptance of a methodology it has verified to its satisfaction in the past.

Consequently, this Court is not convinced that NTN's reported U.S. credit is unrealistic and Commerce's decision to accept NTN's reported U.S. credit expense is upheld.

4. *Home Market Discounts, Return Rebates, PSPAs, etc.*

In calculating FMV and U.S. price, Commerce must determine the price actually charged by a respondent for the merchandise at issue, including discounts, rebates and price adjustments. *See* 19 U.S.C. § 1677a & 1677b (1988). As this Court and the CAFC have stated on several occasions, 19 C.F.R. § 353.56(b)(2) (1994) explicitly provides for a deduction from FMV as part of the ESP offset for all selling expenses except direct selling expenses. *See, e.g., Torrington Co. v. United States*, 82 F.3d 1039, 1051 (Fed.Cir. 1996); *NSK Ltd. v. United States*, 21 CIT ——, ——, 969 F.Supp. 34, 41 (1997).

In the Final Results, Commerce stated its policy regarding claims for certain adjustments to FMV, stating the following:

> [W]e accept claims for direct discount, rebate, and price adjustments to FMV if actual amounts are reported for each transaction and the adjustment is not

based on allocations.... Just as we do not allow respondents to report average prices, we do not allow average direct additions to or subtractions from FMV.... However, if allocated scope-specific adjustments were granted as a constant and fixed percentage of sales on all transactions for which they were reported, such that the allocations reflected the actual amounts for each individual sale, we allow the adjustment as a direct adjustment to FMV. Alternatively, if these scope-specific adjustments were allocated on a customer- or product-specific basis, but there is no evidence of a fixed or constant percentage, we treat them as indirect selling expenses.

We also do not allow any direct adjustments to FMV if the allocation includes non-scope merchandise. The only exception is if the adjustment was granted as a fixed and constant percentage of all sales such that the apportionment of the total expense to in-scope and non-scope merchandise yielded the exact amount per unit paid on sales of in-scope merchandise.

61 Fed.Reg. 57,640 (citations omitted). In accordance with its stated policy, Commerce made pertinent decisions regarding the claimed adjustments at issue in this review.

### a. *NTN's Home Market Discounts and NSK's Return Rebates, PSPAs and Lump–Sum PSPAs*

In the Final Results, Commerce treated NTN's home market discounts as indirect selling expenses because NTN's allocation methodology for its discounts was not transaction-specific and there was no evidence on the record that NTN granted its discounts as a fixed percentage of its sales. Further, because it could not determine that the transaction amounts NSK reported for its return rebates were identical to those that were actually incurred for each individual sale, Commerce treated the return rebates as indirect selling expenses. Moreover, Commerce treated NSK's reported PSPAs as indirect selling expenses because NSK's allocation methodology for its PSPAs was neither transaction-specific nor representative of a fixed and constant percentage, and there was no evidence demonstrating that the PSPAs were granted as a fixed and constant per-

centage of all sales to the customer. *See Final Results,* 61 Fed.Reg. 57,640.

Timken claims that Commerce erred in treating NTN's home market discounts and NSK's return rebates, PSPAs and lump-sum PSPAs as indirect selling expenses because pertinent case law requires that if expenses, by their nature, are directly related to particular sales, they cannot be treated as indirect expenses. Timken's Mem. Supp. Mot. J. Agency R. at 34–46.

NTN argues that Commerce should have treated its home market discounts as direct expenses and made a direct adjustment to FMV. NTN's Mem. Supp. Mot. J. Agency R. at 8–13. NSK similarly alleges Commerce should have treated its return rebates, PSPAs and lump-sum PSPAs as direct expenses and made a direct adjustment to FMV. NSK's Mem. Supp. Mot. J. Agency R. at 18–20.

Commerce responds that the case should be remanded for it to reconsider its decision regarding the discounts, rebates and adjustments discussed above. Def.'s Partial Opp'n to Mots. J. Agency R. at 31–39.

In reply, NTN asserts that, because of the nature of its discount program, the discounts are not allocated within the accounting definition of the term, and so, there is a clear and consistent method for determining the exact discount given each transaction. NTN's Reply Mem. Supp. Mot. J. Agency R. at 2–4.

In *NSK,* 21 CIT at ——, 969 F.Supp. at 44–46, this Court addressed the claims at issue here and concluded that NTN's home market discounts and NSK's return rebates, PSPAs and lump-sum PSPAs should be treated as direct expenses. Relying on *Torrington,* 82 F.3d at 1050–51, the Court stated that, although NSK and NTN could not tie their discounts, return rebates, PSPAs and lump-sum PSPAs to specific transactions, they represented expenses related to particular sales of in-scope merchandise. *NSK,* 21 CIT at ——, 969 F.Supp. 34, 44, 45, 46.

Consequently, in accordance with *NSK* and in light of *Torrington,* 82 F.3d at 1050–51, this case is remanded to Commerce to treat

NTN's home market discounts and NSK's return rebates, PSPAs and lump-sum PSPAs as direct expenses.

### b. *NSK's Distributor Incentive Rebates and Performance Incentive Rebates*

In the Final Results, Commerce denied NSK's claims for direct adjustments to FMV for distributor incentive rebates and performance incentive rebates. Commerce was not convinced that NSK incurred the distributor incentives as a constant and fixed percentage of its sales to its distributor because, by reporting this expense on the basis of its sales to distributors, NSK neither calculated accurate individual-transaction expense amounts nor accurately apportioned the expenses to in-scope and non-scope merchandise. Similarly, with respect to performance incentives, Commerce determined that NSK's allocation methodology did not result in an accurate apportionment to in-scope merchandise and the record evidence did not provide an alternative method that would allow Commerce to remove the expense amounts for non-scope merchandise. *See Final Results*, 61 Fed.Reg. 57,641–42.

NSK contends Commerce admits that it inappropriately denied NSK's claim that distributor incentives should be deducted as a direct expense from FMV in its recent 1993–94 antifriction bearing ("AFB") review and in its new regulations. NSK's Mem. Supp. Mot. J. Agency R. at 20–23 (citing *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 Fed.Reg. 66,472, 66,503 (Dec. 17, 1996)). NSK also alleges Commerce's rejection of distributor incentive rebates was improper because, as Commerce verified, NSK's end-customer was the distributor and not the sub-distributor. NSK, therefore, had no direct knowledge of its customers' sales, and so, could not allocate these incentives to sales by the distributor to the sub-distributors. *Id.* at 21 (citing *NSK Home Market Sales Verification Report*, P.R. Doc. No. 182,

at 16, Timken's Opp'n App., Ex. 6 (July 8, 1994)).

Further, NSK argues that, with respect to performance incentive rebates, Commerce incorrectly concluded that a distributor's increase in purchases on non-scope products does not affect rebate earned by that distributor's purchase of in-scope materials. In particular, NSK claims Commerce acknowledged that NSK's performance incentive rebates were directly dependent on a distributor's percentage increase in purchases from NSK and that a distributor received a constant rebate percentage where its improvement of sales was unchanged throughout the period of review. NSK's Mem. Supp. Mot. J. Agency R. at 22–23 (citing *Final Results*, 61 Fed.Reg. 57,641–42).

As a preliminary matter, the effective date for Commerce's new regulations is June 18, 1997, long after the initiation of the review at issue. *See Antidumping Duties; Countervailing Duties*, 62 Fed.Reg. 27,296, 27,296 (May 19, 1997). Further, as this Court noted in *NSK*, 21 CIT at ——, 969 F.Supp. 34, at 43 n. 3, "Commerce's recent effort to establish more consistent guidelines and decrease litigation over allocation issues has no bearing on litigation over Commerce's previous determinations." Hence, Commerce's determinations in the 1993–94 AFB review have no bearing on the Final Results in this case.

■ This Court has consistently held that direct adjustments to FMV are inappropriate if they include both in-scope and non-scope merchandise. *See, e.g., Federal–Mogul*, 20 CIT at ——, 918 F.Supp. at 408; *Torrington*, 19 CIT at ——, 881 F.Supp. at 640. In this case, Commerce properly denied NSK's claim that distributor incentives should be deducted as a direct expense from FMV. As this Court stated in *NSK*, 21 CIT at ——, 969 F.Supp. at 45, if NSK cannot tie its distributor incentive rebates to particular sales, the amount to which they are attributable to in-scope merchandise is unclear. Whether NSK actually has the direct knowledge necessary for such a determination is not of import; it matters only that Commerce could not make such a determination. NSK reported its rebate amounts as a percentage of its own sales to each distributor

during the period of review. *See Final Results,* 61 Fed.Reg. at 57,641. Because the distributors sold both in-scope and non-scope NSK merchandise to NSK-approved sub-distributors, Commerce could not determine the amount attributable to rebates on in-scope merchandise.

Similarly, upon inspection of the record, it is evident that Commerce properly determined that NSK provided insufficient data indicating the proportion of the performance incentive rebate additional sales that were of scope merchandise. Under NSK's performance incentive plan, NSK granted distributors an incentive rebate based on the distributors' improvement in sales over a specified time period where the percentage rebated was directly dependent on a distributor's percentage increase in purchases from NSK. *Final Results,* 61 Fed.Reg. 57,641. However, a distributor's improvement in sales depended on additional purchases of both in-scope and non-scope merchandise. *See id.* at 57,642. Hence, because Commerce could not know the extent to which the performance incentive rebates were attributable to the sale of scope merchandise, Commerce properly denied NSK's claim for a direct adjustment.

### c. *NSK's Stock Transfer Commissions*

In the Final Results, Commerce denied adjustments for stock commissions because, while the commissions were granted as a fixed and constant percentage of the sales of the distributor who needed parts for the end user, they were not granted as a fixed and constant percentage of NSK's sales to the supplying distributor. 61 Fed.Reg. 57,642.

NSK claims Commerce improperly denied its adjustments for stock transfer commissions because, unlike rebates, discounts and PSPAs, which could be incurred only if NSK makes a sale, NSK incurs stock transfer commissions even when it makes no sale. NSK's Mem. Supp. Mot. J. Agency R. at 23–24.

Commerce consents to a remand to treat the commissions as indirect expenses, following the policy it recently applied in the 1993–94 AFB review. Def.'s Partial Opp'n to Mots. J. Agency R. at 38–39.

First, a request by Commerce for a remand does not control the Court. *Gulf States Tube Div. of Quanex Corp. v. United States,* 21 CIT ——, ——, 981 F.Supp. 630, 647 (1997) (citing *Hylsa, S.A. de C.V. v. United States,* 21 CIT ——, ——, 960 F.Supp. 320, 322 (1997) (denying Commerce's request for a voluntary remand)). Further, as the Court noted in *NSK,* 21 CIT at ——, 969 F.Supp. at 43 n. 3, and reiterated above, Commerce's effort in the 1993–94 AFB review to establish more consistent guidelines and decrease litigation over allocation issues has no bearing on litigation over Commerce's previous determinations, including the Final Results in this case.

In *NSK,* 21 CIT at ——, 969 F.Supp. at 45, the Court upheld Commerce's decision to treat NSK's stock transfer commissions as direct expenses because NSK could not isolate the percentage of commissions paid to distributors for stock transfers of the subject merchandise between distributors. Similarly, in this case, NSK has again failed to isolate this percentage. Consequently, NSK's stock transfer commissions are properly treated as direct expenses and are not entitled to ESP offset treatment.

### 5. *Revocation of Antidumping Duty Order With Respect to Honda*

Under 19 U.S.C. § 1675(c) (1988), Commerce may revoke an antidumping duty order, in whole or in part, if it determines that "sales at less than fair value no longer exist[ ]." S.Rep. No. 249, 96th Cong., 1st Sess. 80 (1979). According to Commerce's regulations, it may revoke an antidumping duty order upon finding that a producer or reseller has not sold the merchandise at issue at less than fair market value for three consecutive review periods, including the instant review period, and concludes that the producer or reseller would not do so in the future. *See* 19 C.F.R. § 353.25(a) (1994).

In this case, Commerce determined that Honda did not dump the merchandise at issue during the three year period of January 1977 through July 1980 and, subsequently, from August 1, 1980 through September 1,

1981, known as the "gap period."[1] *Final Results*, 61 Fed.Reg. at 57,650. However, under transition provisions surrounding a 1984 change in the law requiring Commerce to conduct administrative reviews upon request, if preliminary results were completed but a request for review was not received, Commerce would not issue final results and the preliminary results would have no force or effect. *Preliminary Results*, 60 Fed.Reg. at 22,353. Because Commerce did not receive a request to review Honda for the 1980–81 period, Commerce did not issue final results finalizing Honda's revocation and the preliminary results for the 1980–81 period and the intent to revoke had no official standing. *Id.*

Finally, in November 1992, Honda requested final revocation from the TRB dumping finding at issue. *Id.* In accordance with Commerce's policy in similar situations where revocation proceedings were begun but never finalized and a significant backlog exists, Commerce performed an "update" review of Honda covering the most recent one-year period, the 1992–93 review period. *See Final Results*, 61 Fed.Reg. at 57,650. During this period, Commerce again found no dumping for Honda sales. *Id.* Hence, Commerce revoked the outstanding dumping finding on TRBs and certain TRB components, four inches or less in outside diameter, from Japan (the A–588–054 finding), with respect to such exports from Honda. The revocation applied to relevant Honda merchandise entered or withdrawn from warehouse for consumption on or after September 1, 1981, the date of the original tentative revocation, and for which liquidation remains suspended. *Id.* at 57,652.

Timken argues that the three year period of review is too remote in time to provide the basis for revocation. In particular, Timken alleges that sales at fair value during a period more than fifteen years ago cannot be considered relevant to the determination that Commerce must make to revoke; Honda's presence in the U.S. market has grown enormously and there is no assurance that Honda has not altered its business practices in the time that had elapsed since the preliminary determination. Timken's Mem. Supp. Mot. J. Agency R. at 47–48 (citing *Freeport Minerals Co. v. United States*, 776 F.2d 1029, 1032 (Fed.Cir.1985)). Timken further notes that Honda could have finalized its revocation by requesting a review for the 1980–81 period, as Commerce suggested in its transition provisions. Timken's Reply Mem. Supp. Mot. J. Agency R. at 16–17. Finally, Timken challenges Commerce's regulation prescribing three specific conditions for revocation, alleging that Commerce has engaged in legislative rule-making by unlawfully narrowing the scope of 19 U.S.C. § 1675(c) (1988). *Id.* at 18–19 (citing 19 C.F.R. § 353.25(a)).

First, Timken's challenge to 19 C.F.R. § 353.25 is without merit. While section 1675(c) does not set forth any particular conditions for revocation, the statute grants Commerce wide discretion in making such a determination, stating that "*[t]he administering authority* may revoke, in whole or in part, ... an antidumping duty order. ... after review under this section." 19 U.S.C. § 1675(c) (emphasis added). Hence, Commerce's regulation regarding revocation is a valid exercise of Commerce's discretion and is well within the bounds of the statute.

Timken is not questioning Commerce's finding that Honda was not dumping, especially in light of Honda's zero margin during the 1992–93 update review. Nevertheless, Timken brings to the Court's attention the unusual circumstances at issue here, in which Commerce relies, in substantial part, upon its findings from 1977 through 1980.

Commerce's regulation does not specify the three consecutive years that Commerce must review in making its revocation determination. Timken, however, points to the CAFC's decision in *Freeport Minerals*, in support of its position that the House of Representatives Committee "intend[ed] that [Commerce] should *always* use the most up-to-date information available" and that revo-

---

1. The gap period is "the time between the last review conducted giving rise to the tentative decision to revoke, and the date that tentative determination was published." *Matsushita Elec.*

*Indus. Co. v. United States*, 12 CIT 455, 458, 688 F.Supp. 617, 619 (1988), *aff'd*, 861 F.2d 257 (Fed.Cir.1988).

cation determinations should be based on "current data." 776 F.2d at 1032 (citing H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979)). In that case, the court concluded that Commerce abused its discretion in failing to obtain sales data requested by a domestic petitioner within a year of Commerce's tentative revocation determination, thus precluding the petitioner's access to current review findings during the gap period. *Id.* at 1033.

■ The CAFC has explained its holding in *Freeport Minerals,* clarifying that the data upon which Commerce relied in making final a tentative revocation determination "must be current up to the date of *publication of the Notice of Tentative Determination to Revoke or Terminate." UST, Inc. v. United States,* 831 F.2d 1028, 1032 (Fed.Cir.1987) (emphasis added) (citation omitted) (quotations omitted). Contrary to Timken's suggestion, therefore, the CAFC in *Freeport Minerals* did not hold that a final revocation must be current up to the date of the *final* revocation determination but, rather, that Commerce must conduct a gap period review. As the *UST* court stated:

> We did not hold [in *Freeport Minerals* ] ... that the data [Commerce relies upon to make final a tentative determination to revoke] must be current up to the date of the final determination. Indeed, in view of Commerce's extensive reviews of periods subsequent to tentative determinations and the time-consuming nature of such reviews, a requirement that the data be current to the date of the *final* revocation determination frequently would make it impossible ever to render a final determination on revocation. ·

*Id.* at 1032–33 (emphasis added). *See also Matsushita,* 12 CIT at 463–64, 688 F.Supp. at 623 (holding Commerce is not required to conduct any post-gap period reviews but could conduct an update review of the most recent period for determining final revocation, although notice of tentative revocation was published almost three years before court's decision).

■ Nevertheless, the Court finds Commerce's decision to revoke the antidumping duty order at issue with respect to Honda to be a unique and problematic situation that has not been previously addressed. In the unusual circumstances at issue, in accordance with its regulations, Commerce investigated Honda's relevant TRB sales and concluded that Honda had a dumping margin of zero for the three consecutive years between 1977 and 1980. However, Honda is a much different company than it was in 1980. For example, in 1982, Honda produced less than 1000 automobiles in the United States, compared to over 450,000 in 1992. *See Honda Questionnaire Response, Section IV,* P.R. Doc. No. 37, Ex. 9, at 41, Timken's Reply App., Pub. Ex. 2 (Jan. 19, 1994). This is particularly relevant because Honda also reported that it imports TRBs for replacement and original replacement parts for its U.S.-manufactured automobiles. *Id.* at 1. What the Court finds exceptionally disturbing, however, is that a preliminary finding for a period ending twelve years before the instant review period would constitute a basis for this revocation after Honda ignored the opportunity for revocation Commerce established in its transition provisions. *See Preliminary Results,* 60 Fed.Reg. at 22,353.

It is uncontested that, under Commerce's transition provisions, if preliminary results were completed but a request for review of the most recent period was not received, Commerce would not issue final results and the preliminary results would have no force or effect. *See id.* In its Preliminary Results to this review, Commerce explicitly stated the following:

> On August 30, 1985, we sent letters to all interested TRB parties asking them to indicate the periods and companies for which [Commerce] had not issued final results of review so that parties could request a review. Because we had not yet published a final results notice for Honda for the 1980–81 period, this period was included in our letters. In our August 13, 1985, Federal Register publication of our transition provisions ... we explicitly stated that if preliminary results were completed, but a request for review was not received, we would not issue final results and the preliminary results would have no force or effect. *Because we did not receive a re-*

*quest to review Honda for the 1980–81 period, we did not issue final results, we did not finalize Honda's revocation, and the ... preliminary results and intent to revoke have no official standing.*

*Id.* (emphasis added) (citations omitted). This language indicates that Commerce itself admits these early Honda sales reviews lack official standing. While Commerce attempts to addresses this concern by pointing to the additional 1992–93 update review, this current analysis is the only valid review of Honda sales and alone cannot constitute the basis for revocation.

The Court sympathizes with both Honda and Commerce, especially because there is no indication of Honda dumping and there has been no such finding in either the 1977–80 reviews or the 1992–93 update review. However, under the present circumstances, this Court is compelled to fashion an appropriate remedy and require Commerce to expend the resources necessary to ensure the proper administration of the dumping law. *See Sharp Corp. v. United States,* 837 F.2d 1058, 1064 (Fed.Cir.1988) (holding that the ultimate determination of whether Commerce should be ordered to decide outstanding administrative reviews or to issue a final decision on revocation is left to this Court's discretion).

The Court emphasizes that its holding is limited to the unique circumstances of this case and that its decision here is in no way contrary to the holding of *UST* or *Matsushita.* Unlike those cases, while Commerce conducted an update review of relevant Honda sales for the most recent period of review, Honda failed to make a timely request for review of its 1980–81 sales, as set forth by Commerce in its August 13, 1985, Federal Register publication, and the intent to revoke based on the Honda sales investigations between 1977 and 1980 had no force or effect.

Consequently, Commerce's decision to revoke the antidumping duty order at issue with respect to Honda is reversed. This issue is remanded for Commerce to investigate possible dumping of relevant Honda TRB sales during the period April 1, 1993, through March 31, 1997. Upon a determination that Honda's dumping margin has been

zero or *de minimis* for this period, and pursuant to a request for revocation by Honda, Commerce may revoke the antidumping duty order with respect to Honda.

**6. *Use of Related Party Cost Data for Calculating FMV***

During the review, Commerce requested that NSK demonstrate that the transfer price for inputs purchased from related suppliers was at arms'-length and to supply COP information. NSK supplied Commerce with transfer price and COP inputs that it purchased from its related parties. Commerce used the related party cost information if the COP for the input exceeded the transfer price that NSK reported for the input. *See Final Results,* 61 Fed.Reg. at 57,644.

NSK argues that Commerce had no authority under either 19 U.S.C. § 1677b(e)(2) (1988) or § 1677b(e)(3) to request cost data for parts obtained from related party suppliers without prior reason to believe or suspect that the inputs were sold below COP. NSK's Mem. Supp. Mot. J. Agency R. at 26–32.

In *NSK Ltd. v. United States,* 19 CIT ——, ——, 910 F.Supp. 663, 668–70, *aff'd,* 119 F.3d 16 (Fed.Cir.1997), this Court addressed NSK's identical claim. The Court first recognized that Commerce may disregard transfer prices, pursuant to 19 U.S.C. § 1677b(e)(2) (1988), if the transfer price or any element of value does not reflect their normal market value, or 19 U.S.C. § 1677b(e)(3), if Commerce has reasonable grounds to believe or suspect that a transfer price for a major input is below its COP. The Court then rejected NSK's argument that section 1677b(e)(2) does not authorize Commerce to request COP data for inputs, stating that the section "provides a basis for Commerce to request cost data about parts purchased from related suppliers as long as the respondents reported or relied on transfer prices." *NSK,* 19 CIT at ——, 910 F.Supp. at 669; *see also NSK,* 21 CIT ——, 969 F.Supp. at 48.

The Court similarly rejected NSK's contention that Commerce is not authorized to request COP data under section 1677b(e)(3) without prior grounds to believe or suspect

below-COP sales. NSK argued that, because sections 1677b(e)(3) and 1677b(b) both address Commerce's authority to conduct cost investigations, the same legal standard must apply to both sections. The Court held that NSK's position was meritless, as the issue in cases involving section 1677b(b) has not been whether Commerce *can* conduct an investigation, but whether Commerce *must*. *NSK*, 19 CIT at ——, 910 F.Supp. at 670 n. 5.

 NSK's present claims are identical to those previously decided against NSK and the Court finds no reason to depart from its consistent position on this issue. Commerce therefore properly requested and used COP data for inputs that NSK obtained from related suppliers.

### 7. *Exclusion of Samples Given Without Charge*

 During the review, Commerce included NSK's zero-priced U.S. sales in NSK's U.S. database. *Final Results*, 61 Fed.Reg. at 57,640. However, as NSK notes, *see* NSK's Mem Supp. Mot. J. Agency R. at 32–33, the CAFC has held that samples and other similar transfers to potential customers without consideration do not constitute sales. *NSK Ltd. v. United States*, 115 F.3d 965, 975 (Fed.Cir.1997). Consequently, in light of the CAFC's decision in *NSK*, this issue is remanded to Commerce to exclude any zero-priced sample sales from NSK's U.S. database.

### 8. *Recalculation of Below–Cost Sales*

NSK claims that, pursuant to Commerce's Policy Bulletin 94.4 (March 25, 1994), in determining a company's costs of production for antidumping purposes, Commerce is to use the actual COP to value inputs acquired from companies that are directly or indirectly related by more than fifty percent. NSK's Mem. Supp. Mot. J. Agency R. at 33–35. After collecting responses from NSK's related supplier for the TRBs at issue, NSK contends Commerce improperly used the higher of the transfer price or the reported COP for the inputs from the related supplier in calculating NSK's COP. *See id.* Commerce admits that it relied on the improper COP variable and consents to a remand to

correct the error. Def.'s Partial Opp'n to Mots. J. Agency R. at 53–54.

Upon review of the record, the Court concludes that Commerce failed to use the actual COP to value inputs acquired from companies that are directly or indirectly related to the reviewed company by over fifty percent in accordance with Policy Bulletin 94.4. Consequently, this issue is remanded to Commerce to recalculate the below-cost sales using the COP reported by NSK's related supplier of inputs.

### 9. *Related Party Commission Payments*

NTN made commission payments to its related U.S. affiliate, NMBCA, in exchange for services NMBCA provided to NTN in connection with certain NTN purchase price sales. NTN excluded these expenses from its reported U.S. indirect selling expenses for ESP sales because the payments were not related to ESP sales. Commerce, however, relying on *LMI–La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455 (Fed. Cir.1990), treated the payment to NMBCA as an indirect selling expense for NTN's purchase price sales and deducted the payment amount from NTN's reported U.S. indirect selling expenses for its ESP sales. *See Final Results*, 61 Fed.Reg. at 57,638.

NTN claims Commerce's reliance on *LMI–La Metalli* is misplaced, and contends that Commerce should not make any adjustment to purchase price for the commission payments at issue because the payments were simply intracompany transfers of funds that Commerce considers part of the general operating expenses of a company. NTN's Mem. Supp. Mot. J. Agency R. at 13–15.

Commerce recognizes that its explanation in the Final Results fails to explain the circumstances in which it treats related party commissions as intracompany transfers and when it applies its two-prong test for determining whether a circumstance of sale adjustment should be made to FMV for commissions. Def.'s Partial Opp'n Mots. J. Agency R. at 56. Commerce further admits that it made conflicting statements as to whether NTN had included the commission payments from its reported U.S. indirect sell-

ing expenses for its ESP sales and requests a remand to clarify the statements. *Id.*

Timken disagrees with NTN and with Commerce's position reconsidering its stance in the Final Results, claiming the commission payments at issue should be either treated as direct selling expenses or, at least, remain indirect selling expenses. Timken's Opp'n to Mots. J. Agency R. at 51–52.

NTN replies that the commission payments at issue were intracompany transfers and that the regulations under which this review was conducted do not provide for an adjustment for such payments. NTN's Reply Mem. Supp. Mot. J. Agency R. at 4–6.

The Court agrees with Commerce that a remand is necessary for Commerce to explain the points indicated and reconsider its treatment of the commission payments to NMBCA. Consequently, this issue is remanded for Commerce to: (1) explain the circumstances in which it treats related party commissions as intracompany transfers and when it applies its test for determining whether a circumstance of sale adjustment should be made to FMV for commissions; (2) explain the conflicting statements as to whether NTN's commission payments were included in or excluded from indirect selling expenses for ESP transactions; and (3) reconsider its treatment of the commission payments to NMBCA.

10. *U.S. Selling Expenses Based on Level of Trade*

NTN reported its selling expenses during the period of review based on level of trade in the U.S. During the review, Commerce accepted NTN's level of trade methodology but, following notification by Timken of an alleged inconsistency, reallocated certain NTN U.S. selling expenses without regard to different levels of trade based upon discovery of a discrepancy in NTN's reported total U.S. sales value for scope merchandise during the period of review. *Final Results,* 61 Fed.Reg. at 57,636.

NTN asserts this "discrepancy" is not an error but merely a difference that arose because of the different methodologies used in responses to questionnaire sections A and B.

In particular, NTN claims that the figure in Exhibit A–19 does not include the sale of further processed items, while the figure in Exhibit B–8 does include such sales. NTN's Mem. Supp. Mot. J. Agency R. at 15–16 (citing *NTN Supplemental Questionnaire Response, Section V,* C.R. Doc. No. 44, Ex. A–19, NTN's App., Ex. 4, and C.R. Doc. No. 14, Ex. B–8, at worksheet # 5, NTN's App., Ex. 4 (May 31, 1994)). According to NTN, unlike previous reviews, Commerce did not perform an ESP verification of NTN, and so, Commerce improperly resorted to its own vastly simplified and distortive methodology upon discovering the difference between the exhibits. *Id.* at 15–19.

NTN further alleges that Commerce has, in effect, made an adverse inference by developing an alternative methodology, without affording NTN a reasonable opportunity to satisfy evidentiary concerns known only to Commerce. *Id.* at 18–19 (citing *NTN Bearing Corp. v. United States,* 17 CIT 1149, 835 F.Supp. 646, 650 (1993), *aff'd,* 41 F.3d 1519 (Fed.Cir.1994)). NTN therefore contends this issue should be remanded for Commerce to recalculate NTN's margins based on NTN's submitted U.S. selling expenses.

Commerce first responds that it did not effectively draw an adverse inference penalizing NTN but, rather, addressed a discrepancy pointed out by Timken in its administrative case brief, to which NTN never replied. Thus, according to Commerce, NTN had ample opportunity to respond to Timken's concern but failed to address the matter in its administrative rebuttal brief. Commerce therefore maintains NTN has not demonstrated that Commerce should recalculate the selling expenses using NTN's reported selling expenses. Def.'s Partial Opp'n to Mots. J. Agency R. at 57–58.

Nevertheless, Commerce asks for a remand to reconsider its treatment of the level of trade-specific selling expenses in light of *Timken Co. v. United States,* 20 CIT ——, ——, 930 F.Supp. 621, 627–29 (1996). Def.'s Partial Opp'n to Mots. J. Agency R. at 58–59. In *Timken,* the Court remanded to Commerce to explain how it determined that NTN's selling expenses varied across levels of trade, stating that, while Commerce has

discretion in determining whether an importer is entitled to an adjustment to FMV, there must be a direct relationship between the expenses and the relevant sales. *Timken*, 20 CIT at ——, 930 F.Supp. at 627–29.

Timken maintains Commerce properly allocated NTN's U.S. selling expenses in the Final Results. Timken reinforces its position by noting that, because the Court sustained Commerce's rejection of NTN's U.S. selling expense allocations in *Timken Co. v. United States*, 21 CIT ——, Slip Op. 97–87, 1997 WL 374353 (July 3, 1997), Commerce properly allocated NTN's expenses in the Final Results in a manner different from that which NTN reported. Timken's Opp'n to Mots. J. Agency R. at 53–57.

In reply to Commerce and Timken, NTN denies it had the opportunity to explain any discrepancy, adding that it was unaware of any dispute or confusion over its questionnaire response figures because there was no verification in the underlying review. NTN further notes Commerce accepted NTN's identical method of reporting total U.S. sales in previous reviews. NTN's Reply Mem. Supp. Mot. J. Agency R. at 6–7.

Upon review of the record, the Court agrees that the discrepancy at issue may indeed have been caused simply by NTN's reporting differences in the questionnaire, *i.e.*, the inclusion of further processed goods in the B–8 figure but not in the A–19 figure. However, the use of NTN's Exhibit B–8 allocation of expenses with this discrepancy would distort NTN's dumping margins, as NTN's methodology in Exhibit B–8 of its questionnaire response allots expenses to sales not reported on NTN's computer tape, which was used to calculate NTN's margins. ■ Moreover, NTN clearly failed to address this inconsistency at the administrative level by responding to Timken's concerns.

Despite Commerce's treatment of NTN's allocation of U.S. selling expenses in the past, NTN should have addressed Timken's assertions, which were clearly spelled out in Timken's case brief in the administrative proceedings. *See Timken's Admin. Case Brief (Confid.)*, C.R. Doc. No. 107, at 33–34, Timken's Opp'n App., Ex. 21 (July 21, 1995). Consequently, as NTN failed to address the inconsistency in its data below, the Court refuses to remand this issue for Commerce to recalculate the expenses at issue using NTN's reported U.S. selling expenses.[2]

Nevertheless, in accordance with *Timken*, 20 CIT ——, 930 F.Supp. 621, this issue is remanded for reconsideration of Commerce's treatment of NTN's level of trade-specific U.S. and home market selling expenses.[3]

### 11. Interest Expenses Incurred for Financing Cash Deposits

NTN claimed a downward adjustment to its reported U.S. indirect selling expenses for interest on cash deposits of estimated antidumping duties. Commerce denied the adjustment, stating that cash deposits of estimated duties are provisional in nature because they may be refunded, with interest, at some future date, thereby offsetting the interest expenses incurred. *Final Results*, 61 Fed.Reg. 57,638.

NTN alleges that Commerce's treatment of NTN's interest expenses is contrary to Commerce's treatment of these expenses in the AFB determinations upheld by this Court. NTN's Mem. Supp. Mot. J. Agency R. at 19–22; NTN's Reply Mem. Supp. Mot. J. Agency R. at 7–11. Commerce consents to a remand to reconsider its treatment of NTN's interest expense. Def.'s Partial Opp'n to Mots. J. Agency R. at 59.

---

**2.** This case is easily distinguished from *Böwe-Passat*, where Commerce attempted to penalize the respondent for deficiencies not spelled out in Commerce's correspondence with the respondent and which Commerce did not disclose until after it was too late. *See* 17 CIT at ——, 835 F.Supp. at 650.

**3.** On remand of *Timken*, 20 CIT ——, 930 F.Supp. 621, Commerce was "unable to determine on the basis of the information provided by NTN whether expenses varied according to level of trade" and rejected NTN's level of trade allocation methodology. *Timken*, 21 CIT at ——, 1997 WL 374353. The Court upheld Commerce's conclusion and decision to deny NTN a level of trade adjustment. *See id.* Nevertheless, Commerce's finding and the Court's ultimate decision in that review does not automatically mandate the same result on this remand.

Timken opposes a remand on this issue, contending that Commerce's rejection of this adjustment conforms with Commerce's recent practice of rejecting downward adjustments for imputed interest expenses, which Commerce established in a reasonable exercise of its discretion. Timken's Opp'n to Mots. J. Agency R. at 58–59 (citing *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 62 Fed. Reg. 31,566, 31,569 (June 10, 1997) (1995–96 AFB review) and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Preliminary Results of Antidumping Duty Administrative Reviews*, 62 Fed. Reg. 47,452, 47,455 (Sept. 9, 1997) (1995–96 TRB review)). Timken adds that allowing an expense reduction defeats the purpose of the statutory provision for interest on under- and over-deposits of antidumping duties by providing respondents with an incentive to prolong litigation so as to avoid actual payment of duties. *Id.* at 59–60 (citing 19 U.S.C. § 1677g (1988)).

 Upon review of the record, the Court concludes that Commerce's treatment of NTN's interest expense is at odds with its Court-approved treatment of such expenses in the 1991–92 and 1992–93 AFB proceedings. *See NSK*, 21 CIT at ——, 969 F.Supp. 34, at 55; *Federal–Mogul Corp. v. United States*, 20 CIT ——, ——, 950 F.Supp. 1179, 1182–83 (1996). While Timken correctly points out that Commerce has altered its practice and preliminarily decided to deny adjustments for the cost of financing cash deposits in the recent 1995–96 AFB and TRB reviews, Commerce may, in certain circumstances, reasonably change its methodology from review to review. *See, e.g., NTN Bearing Corp. of Am. v. United States*, 20 CIT ——, ——, 905 F.Supp. 1083, 1095 (1995) (Court allowed Commerce to depart from its longstanding practice of automatically accepting respondents' accounting methodology

so long as it was reasonable and was used in the normal course of business where a respondent's methods of reporting expenses were found to be factually unsound); *see also NSK Ltd. v. United States*, 19 CIT ——, ——, 896 F.Supp. 1263, 1275 (1995), *aff'd in part and rev'd in part*, 115 F.3d 965 (Fed. Cir.1997) (allowing Commerce to depart from its previous reporting methodology). However, the reasonableness of Commerce's recent departure is not presently before the Court. *See NSK*, 21 CIT at ——, 969 F.Supp. 34 at 43 n. 3.

Consequently, this issue is remanded to Commerce to allow NTN's offset to its interest expenses to account for interest expenses on cash deposits of estimated antidumping duties in conformance with *NSK*, 21 CIT at ——, 969 F.Supp. at 55, and *Federal–Mogul*, 20 CIT at ——, 950 F.Supp. at 1182–83.

## 12. *One Average Rate to Adjust Further Manufacturing and CV for Related Party Inputs*

Commerce aggregated data NTN obtained from a related supplier to calculate one average rate to adjust further manufacturing and CV for related party inputs. *See Final Results*, 61 Fed.Reg. at 57,645. NTN argues Commerce should have made product-specific adjustments to these inputs because they would yield more accurate results than an overall average adjustment on sales. NTN notes that its related supplier submitted product-specific cost data concerning the inputs it supplied to NTN, but claims Commerce refused to use this information. NTN's Mem. Supp. Mot. J. Agency R. at 23–24 (citing *Related Party Submission*, C.R. Doc. No. 13, NTN's App., Ex. 5 (March 7, 1994)).

Commerce responds that NTN's related party supplied Commerce with inputs of various models of retainers, and not data that would permit Commerce to tie specific retainers to specific TRB models. As the record did not otherwise contain such data, Commerce claims it reasonably used the one average rate for all products. Def.'s Partial Opp'n to Mots. J. Agency R. at 60.

NTN replies that Commerce cannot make a BIA adjustment to a respondent's cost data absent a request for that data and the failure of the party to comply, and so, Commerce and Timken improperly fault NTN for not providing information that was never requested. NTN's Reply Mem. Supp. Mot. J. Agency R. at 11–12 (citing *Questionnaire, Section VI,* P.R. Doc. No. 168, at VI–7 through VI–10, NTN's Reply App., Ex. 4). NTN bolsters its argument by alleging Commerce's position is a *post hoc* rationalization because the Final Results do not mention Commerce's inability to make corrections. *Id.* at 12–13.

First, the information NTN's related party submitted to Commerce lists retainers sold to NTN, along with the transfer price and cost of production for each product; the submission does not enable Commerce to tie specific retainers to specific TRB models. *See Related Party Submission,* C.R. Doc. No. 13, NTN's App., Ex. 5.

Further, contrary to NTN's reply assertions, Commerce's argument is not a *post hoc* rationalization and Commerce did not resort to BIA as punishment for NTN's related party failing to provide information Commerce never requested. Rather, because NTN's related party did not supply Commerce with information enabling Commerce to tie specific retainers to specific TRB models and the record did not otherwise contain such data, Commerce reasonably chose to aggregate the related supplier's data and calculate a single adjustment figure for all products.

Consequently, under the circumstances, the Court concludes Commerce's decision to aggregate the related supplier's data and calculate a single adjustment figure for all products is supported by substantial evidence.

13. *Level of Trade Adjustment Reflecting Full Difference in Prices Between Levels of Trade*

In the Final Results, Commerce made a level of trade adjustment when comparing home market such or similar merchandise to U.S. merchandise sold at a different level of trade, but declined to make a level of trade adjustment for the full difference in prices between the various levels of trade. *See Final Results,* 61 Fed.Reg. at 57,647.

NTN contends it is contrary to commercial reality to expect that every single sale at a particular level of trade would be made at a different price than a sale of the same merchandise at a different level of trade. NTN further claims that a full price difference adjustment that fully accounts for and reflects differences among levels of trade is necessary to obtain the "apples to apples" comparison required by law. NTN's Mem. Supp. Mot. J. Agency R. at 24–25.

Commerce responds that it refused to make a full price difference adjustment because there was no discernable pattern in the price differences between levels of trade. Def.'s Partial Opp'n to Mots. J. Agency R. at 61–62. In particular, Commerce reiterates its Final Results findings that NTN's percentage price differences revealed that, for numerous models, there was no pattern in price differences between levels of trade and that the range of percentage price differences between levels was erratic. *Id.* (citing *Final Results,* 61 Fed.Reg. 57,647).

Timken agrees generally with the position taken by Commerce. Timken's Opp'n to Mots. J. Agency R. at 63–66.

The Court has previously ruled on this issue, concluding that Commerce's denial was supported by substantial evidence on the record. *See NTN Bearing Corp. of Am. v. United States,* 835 F.Supp. 646, 17 CIT 1149, 1153 (1993). As the facts in this case are virtually identical to those in *NTN* and the Court refuses to reconsider its position, Commerce's decision to deny a level of trade adjustment for the full difference in prices between the various levels of trade is sustained.

14. *Splitting the Prices of Allegedly "Unsplittable" TRBs*

In its analysis during the review, Commerce followed its set-splitting methodology and split certain TRB sets for antidumping calculation purposes that cannot be physical-

ly split. *See Final Results,* 61 Fed.Reg. at 57,630.

NTN contends, simply, that the TRBs at issue should not be split because they cannot be sold individually and their components do not have "such or similar" merchandise. NTN's Mem. Supp. Mot. J. Agency R. at 25–26.

■ As NTN recognizes, *see id.* at 26, this Court has ruled against NTN on this issue. *See NTN Bearing Corp. of Am. v. United States,* 20 CIT ——, ——, 924 F.Supp. 200, 205–06 (1996). Since NTN filed its brief, the CAFC affirmed this Court's judgment in *NTN,* upholding Commerce's decision to split the allegedly unsplittable TRB sets. *See NTN Bearing Corp. of Am. v. United States,* 121 F.3d 687 (Fed.Cir.1997), *reh'g granted and aff'd,* 127 F.3d 1061 (Fed. Cir.1997). Consequently, Commerce is sustained as to this issue.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to: (1) treat NTN's home market discounts and NSK's return rebates, PSPAs, lump-sum PSPAs and stock transfer commissions as direct expenses in light of recent case law; (2) investigate possible dumping of relevant Honda TRB sales during the period April 1, 1993, through March 31, 1997, and, upon a determination that Honda's dumping margin has been zero or *de minimis* for this period and pursuant to a request for revocation by Honda, Commerce may revoke the antidumping duty order with respect to Honda; (3) exclude any zero-priced sample sales from NSK's U.S. sales database; (4) recalculate the below-cost sales for NSK using the COP database submitted by NSK's related supplier of inputs; (5) with respect to related party commissions, (a) explain the circumstances in which it treats related party commissions as intracompany transfers when it applies its test for determining whether a circumstance of sale adjustment should be made to FMV for commissions, (b) explain conflicting statements as to whether NTN's commission payments were included in or excluded from indirect selling expenses for ESP transac-

tions, and (c) reconsider its treatment of the commission payments to NTN's related U.S. affiliate, NMBCA; (6) reconsider its treatment of NTN's U.S. and home market selling expenses with respect to level of trade; and (7) allow NTN's offset to its interest expenses to account for interest expenses on cash deposits of estimated antidumping duties. Commerce is sustained as to all other issues.